IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 4:12-cr-249-O-1 |
| | ) | |
| v. | ) | Sentencing |
| | ) | |
| STEPHAN HAMILTON | ) | March 31, 2014 |

**BEFORE THE HONORABLE REED C. O'CONNOR**
*United States District Judge*
*In Fort Worth, Texas*

**FOR THE GOVERNMENT:**          **MR. CHRIS WOLFE**
US Attorney's Office
Burnett Plaza Suite 1700
801 Cherry St Unit 4
Fort Worth, TX 76102
817/252-5221
Fax: 817-252-5455
Chris.wolfe@usdoj.gov

**FOR THE DEFENDANT:**          **MR. JOHN W. STICKELS**
Stickels & Associates, PC
PO Box 121431
Arlington, TX 76012
817/479-9282
Fax: 817/622-8071
John@stickelslaw.com

**COURT REPORTER:**          **MR. DENVER B. RODEN, RMR**
*United States Court Reporter*
1050 Lake Carolyn Pkwy #2338
Irving, Texas  75039
*drodenrmr@sbcglobal.net*
Phone:  (214) 753-2298

    The above styled and numbered cause was reported by
computerized stenography and produced by computer.

```
 1          (March 31, 2014.)

 2              THE COURT:  I call case number 4:12-cr-249, the

 3     United States versus Stephan Hamilton.

 4              MR. WOLFE:  Good morning, Your Honor.  Chris Wolfe

 5     for the Government and the Government is ready.

 6              THE COURT:  Thank you.

 7              MR. STICKELS:  John Stickels for Stephan Hamilton,

 8     Your Honor.

 9              THE COURT:  Are you ready to proceed?

10              MR. STICKELS:  Yes, Your Honor.

11              THE COURT:  Okay.  Mr. Hamilton, would you please

12     state your full name for the record.

13              THE DEFENDANT:  Stephan David Hamilton.

14              THE COURT:  All right.  Thank you, sir.  You appeared

15     before me on October 15th, 2013, and pleaded guilty to count

16     one of the one count indictment.  On that date I found that

17     your plea was a knowing and voluntary plea supported by an

18     independent basis in fact containing each of the essential

19     elements of these offenses -- of this offense.  You told me at

20     that time that you understood the elements of the offense,

21     agreed to the accuracy of the factual resume, and admitted

22     that you committed all of the essential elements of this

23     offense.  I found you guilty at that time.

24              Mr. Stickels, did you and your client receive in a

25     timely manner a copy of the Presentence Investigation Report
```

1    and the First Addendum to the Presentence Investigation Report

2    and the Second addendum.

3         **MR. STICKELS:**  Yes, Your Honor.

4         **THE COURT:**  And did you carefully review those

5    documents with your client?

6         **MR. STICKELS:**  Yes, Your Honor.

7         **THE COURT:**  Did the Government receive these

8    documents timely?

9         **MR. WOLFE:**  Yes, Your Honor.

10         **THE COURT:**  All right.  Now, there are several

11   objections to these documents.  Mr. Wolfe, would you explain

12   to me why you believe that the Henry statement and the Montes

13   statements are reliable or why they are corroborated.

14         **MR. WOLFE:**  Yes, Your Honor.  Both individuals were

15   debriefed after their arrest and only they -- talked about

16   Mr. Hamilton but they also gave us information about other

17   codefendants who were arrested and so we believed, A, they --

18   they gave -- they gave information that was corroborative on

19   an individual we could test and ideally the information with

20   Mr. Hamilton which jived with information we got from other

21   people as well.

22         **THE COURT:**  All right.  Okay.  Do you have an agent

23   here who can testify to this?

24         **MR. WOLFE:**  No, Your Honor.  And I realize -- in my

25   response, that's all we really have.  The agents are telling

1    me they believed him.  They believed what he said because it

2    corroborated what they heard about others about Mr. Hamilton.

3    That's all we have.  If the Court is uncomfortable with

4    that -- we're not strongly pushing --

5         THE COURT:  It's not that I'm uncomfortable with

6    that, it's just that the evidence has to show that the

7    information is reliable and I understand you are saying that

8    it is reliable, but I'm wanting to know what I can look to

9    factually --

10        MR. WOLFE:  Yes, Your Honor.

11        THE COURT:  -- to understand why that evidence is

12   reliable.

13        MR. WOLFE:  I have nothing further than what's in my

14   response.  I believe the agent was going to be here but I

15   don't see him yet and so that's all the evidence we have, Your

16   Honor.

17        THE COURT:  All right.  We'll -- we'll take a break

18   on this case and we'll wait for him to get here.  We will take

19   your case up momentarily, Mr. Hamilton.

20        MR. WOLFE:  Thank you.

21      (Recess.)

22        THE COURT:  Okay.  Mr. Hamilton, come on back over,

23   please, sir.  All right.  We are back on the record in case

24   number 4:12-cr-249.  Mr. Hamilton, go ahead and have a seat

25   with your attorney there.

1          The United States versus Stephan Hamilton.  All

2     right.  Mr. Wolfe.

3          **MR. WOLFE:**  Your Honor, I believe before we left off

4     you were asking the Government to put forth evidence on why we

5     should trust Mr. Montes and Ms. Pollett.  Is that correct?

6          **THE COURT:**  Henry.  Henry gave a post-arrest

7     statement.

8          **MR. WOLFE:**  Yes, Your Honor.

9          **THE COURT:**  As to drug amounts and so the objections,

10    Mr. Hamilton is to the reliability of those for various

11    reasons and so my question to you is you have codefendants or

12    co-conspirators or just other people in the drug business

13    giving statements that attribute drug transactions to

14    Mr. Hamilton that increase his guidelines and so my question

15    to you is -- and these -- these two are what it appears to me

16    they are objecting to and so my question to you is what

17    evidence do you have that would support a conclusion which you

18    seek that their statements are reliable enough for me to

19    consider in determining the appropriate guideline calculations

20    for Mr. Hamilton.

21         **MR. WOLFE:**  Yes, Your Honor.  Specifically, with

22    Mr. Montes, my understanding is that he gave information --

23    well, the Government -- the Government only had a certain

24    amount of information on him, what -- the amount he was caught

25    with and he gave information about himself that hurt him and,

1 therefore, it boasted -- it bolstered his reliability because
2 he gave information that was detrimental to himself.
3 Therefore, the information against Mr. Hamilton was deemed
4 reliable.
5        THE COURT:  Right.  I just need you to put on
6 evidence --
7        MR. WOLFE:  Thank you.
8        THE COURT:  -- to support that argument.  I
9 understand the argument.  The Addendum I think adopts that
10 argument as well.  But I don't see in -- in your response to
11 the objections or in the addendum some explanation as to why
12 you believe, some factual basis as to why you believe it's
13 corroborated.
14        MR. WOLFE:  The Government calls Officer Bruce
15 Blaisdale.
16        THE COURT:  All right.  Come on up and please raise
17 your right hand to be sworn.
18    (Witness sworn.)
19        **BRUCE BLAISDALE, GOVERNMENT WITNESS,** was sworn
20                    **DIRECT EXAMINATION**
21 BY MR. WOLFE:
22 Q.  Good morning.  Would you please tell us your name and tell
23 us what you do for a living.
24 A.  My name is Bruce Blaisdale and I'm a Fort Worth police
25 officer assigned to DEA.

1   Q.  And have you -- how long have you been in law enforcement?

2   A.  It will be 23 years this year.

3   Q.  And during those 23 years have you had a chance to

4   investigate drug crimes?

5   A.  Yes, sir.

6   Q.  How long?

7   A.  I've been assigned to narcotics about the past 17 years.

8   Q.  You are the case agent handling the case against

9   Mr. Stephan Hamilton?

10  A.  Yes, sir.

11  Q.  You are aware of an individual by the name of

12  Hector Montes?

13  A.  Yes, sir.

14  Q.  Did you arrest Mr. Montes?

15  A.  We did.

16  Q.  Did you have a chance to speak with him post-arrest?

17  A.  Yes, sir.

18  Q.  Can you tell the Court what, if anything, he told you?

19  A.  Mr. Montes was stopped after leaving Mr. Hamilton's house.

20  He was in possession of some U.S. currency and he admitted to

21  delivering 12 ounces of methamphetamine to Mr. Hamilton's

22  residence.  We subsequently interviewed him and he stated that

23  he would sell Mr. Hamilton between 8 and 16 ounces about every

24  other day for a period of about three months.

25  Q.  And prior to meeting Mr. Montes did you have information

1  that Mr. Hamilton sold large amounts of methamphetamine?

2  A.  That's correct.

3  Q.  Did Mr. Montes also give information that would hurt him

4  in some ways?

5  A.  Absolutely.  We would -- without him saying that he

6  delivered the 12 ounces to Mr. Hamilton's residence, all he

7  actually had on him was that he had some U.S. currency and

8  then without him saying that he sold 18 to 16 ounces to

9  Mr. Hamilton, he was basically putting dope on himself which

10  subsequently cost him more time in prison.

11  Q.  Okay.  And based on that plus based -- well, let me ask

12  you this.  You've interviewed defendants in the past.  Do you

13  believe over the period of time you've developed the ability

14  and experience to determine whether or not someone is credible

15  and reliable to you?

16  A.  Yes, sir.

17  Q.  Did he seem to be forthcoming to you?

18  A.  He was very forthcoming.  He didn't appear to minimize at

19  all.

20  Q.  And based on that did you deem his information reliable?

21  A.  Yes, sir, I do.

22  Q.  Okay.  Did you also interview Michael Henry?

23  A.  We did.

24  Q.  And can you tell us the circumstances surrounding his

25  arrest?

1  A.  Mr. Henry originally called the police because he said

2  that his residence had been burglarized.  When the officers

3  arrived they saw evidence of a possible methamphetamine lab

4  and distribution, so they basically froze his residence and

5  prepared a search warrant and inside the -- Mr. Henry was a

6  fifth year chemistry student at the University of Dallas and

7  inside the apartment they found methamphetamine and all the

8  glassware to make meth.  Mr. Henry was interviewed.  He

9  admitted to purchasing meth from Mr. Hamilton and also stated

10  that Mr. Hamilton had purchased all the glassware that was in

11  the residence because he wanted Michael Henry, who was a

12  chemistry student, to start manufacturing methamphetamine and

13  according to Mr. Henry they were going to attempt to start

14  being one of the major suppliers in the Dallas/Fort Worth

15  area.

16  Q.  Did he also give information that would be detrimental to

17  his future?  In other words, information that would hurt him,

18  therefore bolstering his credibility?

19  A.  Yes, sir.

20  Q.  One thing that I forget to ask you about Mr. Montes and

21  just so we're clear, Mr. Montes, he wasn't -- he didn't

22  receive methamphetamine for Mr. Hamilton.  He was a supplier?

23  A.  Correct.  He admitted to being the supplier for --

24  admitted to being one of the suppliers for Mr. Hamilton.

25  Q.  And regarding Ms. Pollett, he was arrested as well?

1    A.  Correct.  She was.

2    Q.  And can you tell us the circumstances surrounding her

3    arrest?

4    A.  We interviewed Mr. Hamilton.  He provided information

5    about Cynthia Pollett.  We provided that information to

6    Oklahoma where she resided and they already had some

7    information but they used the information that Mr. Hamilton

8    provided to execute a search warrant at her residence in which

9    methamphetamine and a large amount of U.S. currency was

10   located.

11   Q.  And she -- Excuse me.  You were eventually able to

12   interview her?

13   A.  I was.

14   Q.  What did she tell you about her activities and her

15   activities with Mr. Hamilton?

16   A.  She stated she had come down here one or two times a month

17   and she would purchase approximately one kilo from

18   Mr. Hamilton each time she would come down.

19   Q.  Now, Mr. Hamilton's information, it helped you arrest

20   Ms. Pollett.  That's been included in the Government's request

21   for a 5K before this Court; correct?

22   A.  Yes, sir.

23   Q.  Okay.  Did you believe Ms. -- Excuse me -- Ms. Pollett's

24   information was reliable?

25   A.  Yes.

1   Q.  Why is that?

2   A.  She seemed very forthcoming.  Ms. Pollett had no criminal,

3   had never even been arrested.  She was fifty-two years old, I

4   believe, but had never been arrested before in her life.  This

5   was her first offense and she, again, put dope on herself.

6          MR. WOLFE:  Your Honor, there is one other issue

7   that's -- before I pass this -- an issue regarding the

8   methamphetamine involving codefendant Dustin Pulido but I

9   don't think the facts are in dispute of this.  I think this is

10  more of an argument.

11         THE COURT:  Go ahead and address that.  I -- I think

12  that the --

13         MR. WOLFE:  Yes, Your Honor.

14         THE COURT:  I -- I don't think the objection should

15  be granted, but go ahead and address it now.

16  BY MR. WOLFE:

17  Q.  You are aware of codefendant Dustin Pulido?

18  A.  I am.

19  Q.  Can you tell us the facts surrounding his arrest?

20  A.  Yes.

21  Q.  Go ahead.

22  A.  I'm sorry?

23  Q.  Can you tell us the facts surrounding his arrest?

24  A.  The first time he was arrested, he drove to Mr. Hamilton's

25  house, picked up -- they went in -- he basically picked up

1    some money that he needed in order to purchase a half a pound

2    of methamphetamine.  Mr. Pulido and a female drove to Dallas,

3    purchased a half a pound of methamphetamine, and on the way

4    back was stopped by the Fort Worth Police Department.  When

5    they got Mr. Hamilton out of the car, he had a pistol in the

6    front of his waistband and there was a half a pound of

7    methamphetamine behind the seat.  He subsequently made bond

8    and we issued a federal arrest warrant for him and a short

9    time later we located him hiding at an apartment off of Royal

10   Lane in Irving and he was arrested and was in possession of

11   like another half ounce of methamphetamine at the time of his

12   arrest.

13   Q.  Okay.  There's information from Mr. Pulido that he used

14   Mr. Hamilton's money?

15   A.  Some of Mr. Hamilton's money, yes.

16   Q.  How do you know that?

17   A.  Because he told us.

18   Q.  What did he tell you?

19   A.  That he went by Mr. Hamilton's residence and picked up

20   some money.  On that same case we also had an informant

21   involved.  An informant confirmed Mr. Pulido had picked up

22   money from Mr. Hamilton in order to purchase a half a pound of

23   methamphetamine.

24   Q.  Okay.  And just to be clear for the Court, was the -- was

25   the ultimate source, was that dope supposed to go to

1    Mr. Hamilton or to Mr. Pulido?

2    A.  Pulido's -- Pulido stated that they were going to split it

3    was what we were told.

4    Q.  But you don't know as to how they were going to split it

5    or the amount of the split?

6    A.  No, I don't.

7         MR. WOLFE:  That's all we have, Your Honor.

8         THE COURT:  All right.  Thank you.  Mr. Stickels.

9         MR. STICKELS:  Thank you, Your Honor.

10                      <u>CROSS-EXAMINATION</u>

11   BY MR. STICKELS:

12   Q.  With regard to Ms. -- is it Pollett?

13   A.  Yes, sir.

14   Q.  Did the Government know about Ms. Pollett before

15   Mr. Hamilton debriefed?

16   A.  We knew about -- well, we knew about Cynthia Pollett.

17   When he was arrested the first time by Fort Worth PD he

18   mentioned Ms. Pollett to her -- to them and that he was

19   supplying her with a kilo of meth at a time.

20   Q.  So Mr. Hamilton told you that after he was arrested?

21   A.  He told the Fort Worth police prior to his federal case

22   that he was -- because he wanted to cooperate and she was one

23   of the people that he talked to them about cooperating on.

24   Q.  So would you have known about Ms. Pollett and her

25   involvement in the meth business without Mr. Hamilton's

1   statement?

2   A.   No.

3   Q.   Now, I think when you testified about Mr. Pulido, you may

4   have said that Mr. Hamilton was the one arrested with the gun

5   in the car?

6   A.   No.  Mr. Pulido was arrested with the gun in his

7   waistband.

8   Q.   So Mr. Hamilton was not arrested with the gun in his

9   waistband in a car.  That was Pulido.

10  A.   No, Mr. Hamilton wasn't in the car.

11  Q.   Now, did Mr. Pulido say how much of the money he got from

12  Mr. Hamilton was supposed to be used to buy meth?

13  A.   I don't recall.

14  Q.   Do you know how much of it was going to be used?

15  A.   I think it was around $1500, but I don't recall off the

16  top of my head.

17  Q.   Now, you've reviewed all the text messages in this case?

18  A.   There was a lot.  Yes.

19  Q.   And did you review the text messages between Mr. Hamilton

20  and Mr. Montes where they talked about how much meth that

21  Mr. Montes was going to take to Mr. Hamilton?

22  A.   I don't remember -- I don't remember them specifically.

23  Mr. Hamilton had over 90,000 text messages on his cell phone.

24  Q.   The text messages in question talk about getting 8 ounces

25  and that's different from the 12 ounces that Mr. Montes said

1   he delivered?

2   A.  I don't -- I'm not saying you are incorrect, I'm just

3   saying I don't remember that text message off the top of my

4   head.

5   Q.  Would you believe the text message is more or what

6   Mr. Montes says is more?

7   A.  If there is a text message saying that, it would certainly

8   be more reliable.

9   Q.  The text message about delivering 8 ounces would be more

10  reliable than what Mr. Montes told you?

11  A.  If that text message exists.

12          MR. STICKELS:  Pass the witness, Your Honor.

13          MR. WOLFE:  No further questions on this issue, Your

14  Honor.

15          THE COURT:  Okay.  You may step down.

16          THE WITNESS:  Thank you.

17          THE COURT:  Mr. Wolfe, what do you -- what is your

18  argument in response to Mr. Stickels's argument about the 8

19  ounce text messages?

20          MR. WOLFE:  Your Honor, I believe the Court should

21  accept Mr. Hamilton's argument.

22          THE COURT:  All right.  And what does that do for the

23  guideline calculation?

24          MR. STICKELS:  In addition, Your Honor, we also

25  objected to any meth allegation from Ms. Pollock --

1      THE COURT:  Pollett.

2      MR. STICKELS:  Pollett -- because the Government

3  obtained knowledge of her after Mr. Hamilton debriefed and

4  would not have known about her and it's not fair to attribute

5  that meth to him after they found out about it from debriefing

6  him -- found out about her from debriefing him.

7      THE COURT:  All right.  I don't see in paragraph 20

8  where there's an indication that he debriefed pursuant to

9  1B1.8.  Is that what you are saying occurred?

10     MR. STICKELS:  Yes, Your Honor.  That was -- that

11 happened before I got appointed and it -- I think it

12 happened -- he debriefed before I got appointed and he did it

13 with the debriefing agreement.

14     MR. WOLFE:  Your Honor, may I --

15     THE COURT:  Yes?

16     MR. WOLFE:  Your Honor, Mr. Hamilton was interviewed

17 more than once and I believe the information he first gave

18 about Ms. Pollett was not under proffer.  It was before his

19 case went federal.

20     THE COURT:  Paragraph 20 indicates that

21 Mr. Hamilton -- paragraph 20 of the Presentence Investigation

22 Report indicates that in a post-arrest and post-Miranda

23 warning statement Mr. Hamilton indicated that I organized the

24 distribution of at least one kilogram of methamphetamine to

25 Pollett on a regular basis and arranged for the meeting.

1   There's no indication in paragraph 20 that statement is

2   protected by 1B1.8.  Is that what you are saying is -- is that

3   the reason why you believe this statement is protected?

4            MR. STICKELS:  Yes, Your Honor.

5            THE COURT:  Because he was protected under that

6   provision of the guideline?

7            MR. STICKELS:  Yes, sir.

8            THE COURT:  And do you have a -- what evidence do you

9   have of that, I guess?

10            MR. STICKELS:  May I have just a moment, Your Honor?

11       (Off-the-record discussion between defense counsel and the

12   defendant.)

13            MR. STICKELS:  Thank you, Your Honor.  Mr. Hamilton

14   proffered on January 18th pursuant to a proffer agreement.

15   Ms. Pollett was arrested on February 8th.  By February 8th it

16   is our position that arrest was the direct result of him

17   proffering on January 18th under the agreement.

18            THE COURT:  January 18 of what year?

19            MR. STICKELS:  2012 -- 2013, Your Honor.

20            THE COURT:  Okay.  But this arrest occurs on November

21   17, 2012.  And so on November 17, 2012, he's telling the

22   police that he delivers on a regular basis to Ms. Pollett a

23   kilogram of methamphetamine.

24            MR. STICKELS:  I understand the Court's position,

25   Your Honor.

1          THE COURT:  Okay.  All right.  Very good then.  I

2    will sustain the Defendant's objection to the attribution of

3    12 ounces of methamphetamine pursuant to Montes's statement

4    and instead apply the 8 ounce figure.

5          I will overrule the Defendant's objection as to the

6    one kilogram that Henry talked about.  I find that statement

7    is reliable, given in the post-arrest setting, and given the

8    testimony from the officer as to why it is -- why he deemed it

9    reliable and I adopt his views on that because I agree with

10   him that in that setting it is reliable, given the

11   circumstances in which it occurred, particularly that it

12   inured to his detriment.

13         I will also overrule the defendant's objection as to

14   the amount attributable to the defendant that he delivered to

15   Ms. Pollett.  I will find that those statements are

16   corroborated by the defendant's own statement in paragraph 20.

17   I don't have any evidence before me that that statement is

18   somehow protected from use at sentencing, so I will overrule

19   that objection and I will find though that the statements by

20   Mr. Montes are sufficiently corroborated and reliable for me

21   to use at sentencing but to the 8 ounce figure, not to the 12

22   ounce figure, so other than the amount, the 12 ounce amount,

23   I'll adopt the views by the officer as to why those figures

24   are reliable and add to my view the text messages pointed out

25   in the defendant's objections.

1        I will note that the Addendum accepts the defendant's

2    objections one, two, three, and so I will accept those as

3    well.

4        I'll deny the objection as to the Pulido $1500

5    amount.  They were -- the defendant and Mr. Pulido were in a

6    jointly undertaken activity here and so for the reasons stated

7    in the addendum and in the Government's response, I will

8    overrule that objection and include those amounts in the

9    guideline calculations.

10        The Addendum has accepted the double counting

11    objections, five and six, and I will accept those as well.

12        The question of the drug amounts attributable to --

13    in connection with the time of Mr. Hamilton working with law

14    enforcement, I will note that he did at times work with law

15    enforcement but I will overrule the objection to including

16    those amounts in the guideline calculations for the reasons

17    stated by the Government in their response to the objections

18    and by the probation officer in the Addendum.

19        My ruling on these objections does not affect the

20    total offense level calculations, so I will overrule the

21    objection to the total offense calculations.

22        And then I will accept the objection as to the age of

23    Mr. Hamilton's daughter and defer ruling on the -- actually, I

24    don't plan on departing upward.  There's a statutory cap of

25    240 months.

1        So based -- Are there any other objections you need a

2   ruling on, Mr. Stickels?

3        **MR. STICKELS:**  No, Your Honor.

4        **THE COURT:**  All right.  Then based on the foregoing,

5   I adopt the fact findings contained in the Presentence Report,

6   the Addendum to the Presentence Report, and the Second

7   addendum to the Presentence Report as modified by my ruling

8   related to Mr. Montes's statement of 12 ounces versus your

9   objection to applying only an 8 ounce, and I, as I stated,

10  will apply only the 8 ounce amount.

11       I will adopt the fact findings contained in the

12  Presentence Report, the Addendum, the Second Addendum as

13  modified but what I said.  I will also adopt, as I mentioned,

14  the Government's arguments and the response to objections that

15  I've accepted and my statements about accepting the officer's

16  views here on the reliability of the information.  I'll also

17  adopt the probation officer's conclusions as to the

18  appropriate guideline calculations and determine that they are

19  as follows:

20       A total offense level of 39.

21       A Criminal History Category of IV.

22       An imprisonment range of 240 months.

23       Fine range of between 3 years and life -- I mean, a

24  supervised release range between 3 years and life.

25       And a fine range between $25,000 and $1 million

1    dollars.

2         The Government has filed a motion for departure under

3    Rule 5K.  I will grant that motion for the reasons stated in

4    the document but reserve ruling on the appropriate sentence

5    after argument.

6         Does the Government wish to be heard on sentencing?

7         MR. WOLFE:  Just briefly, Your Honor.  The Court's

8    granted the Government's motion for 5K but I did want to

9    communicate to the Court that Mr. Hamilton's assistance was

10   not only substantial, it was more than we normally see.  He

11   was quite forthcoming as to his conduct.  He was forthcoming

12   as to his dealings with these other people, and it did help us

13   net multiple individuals as set forth in this agreement.

14        Obviously, the issue was he had been arrested once,

15   cooperated, and then dealt dope again.  That's what made it

16   hard for the Government to decide how to weigh that.  But the

17   information set forth in the 5K is accurate.  We do think but

18   for his information we would not have had these individuals.

19        THE COURT:  So you -- but for you charging him with a

20   twenty year offense, he would be facing thirty years under the

21   guideline -- a minimum of thirty years up to life under the

22   guideline.  So your recommendation in the 5K at the bottom end

23   of your recommendation is almost a 20 year reduction that you

24   seek.

25        MR. WOLFE:  We realize it's significant, Your Honor,

1  but it's because of his -- we thought his information was -- I

2  can have Mr. -- Officer Blaisdale testify, but it was

3  unusually strong and not only did he give information but he

4  gave information in such a way he had texts, he had phone

5  numbers, he had photographs, he had information that we --

6  that made it easy for us.  So it was more than just giving a

7  name and we go hunt-and-peck and find someone but -- he made

8  it easy for us.

9          THE COURT:  All right.  Fine.  Thank you.

10         MR. WOLFE:  That's all we have, Your Honor.

11         THE COURT:  Mr. Stickels, I'll turn the floor over to

12  you, sir.

13         MR. STICKELS:  Your Honor, Mr. Hamilton's mother,

14  Edith Hamilton, is here and would like to address the Court.

15         THE COURT:  Okay.  Very good.  Thank you.  Would you

16  raise your right hand and be sworn, please.

17     (Witness sworn.)

18         THE COURT:  Ma'am, I will be pleased to hear from

19  you.

20         THE WITNESS:  Thank you.  My name is Edith Hamilton.

21  I'm Stephan's mother.

22         And I kind of would like to start at the very

23  beginning to show Stephan's character.  It was around

24  Thanksgiving when Stephan was arrested and I was calling him

25  to invite him home for Thanksgiving and make the plans and I

1    couldn't get a hold of him and he wasn't returning my calls,

2    which was not like him and so I drove by his house and put a

3    little note on the door because there was no answer and

4    Thanksgiving came and went and I still hadn't heard from him,

5    so I began to get very worried and started calling around and

6    I said I think something has happened to Stephan and it was

7    then that I found out he was in jail in Parker County and when

8    I saw him he said, "Mother, I'm sorry, I'm so ashamed of

9    myself that I could not tell you what had happened and that I

10   was in jail."

11          And he has been very remorseful about what he has

12   done, realizing that he's not only hurt his family but myself

13   and his children and his reputation as well.  And he has been

14   very remorseful and has asked me at different times to get in

15   touch with people so that he could contact them and tell them

16   that he was sorry for what he had done in their lives and one

17   person I was not able to -- I didn't know them, I wasn't able

18   to get in touch with them, but he not only believes in being

19   remorseful, but he totally believes in restitution and trying

20   to restore anything that he has destroyed or hurt.

21          And then I wanted to show you the side of Stephan

22   that is a dad and a father.  He married -- when he married his

23   wife, she had a young son.  He is three years old, Tristan,

24   and we thought that he might have some learning disabilities

25   because he acted so strange and you couldn't understand his

1   language and so our family started talking about it and we

2   realized that Stephan -- that Tristan, his stepson, was having

3   trouble hearing, and, you know, Stephan zeroed in on that, got

4   him over to Cooks.  They put tubes in his ears.  The

5   audiologist said that he had so much old infection in his ears

6   that it was impairing his hearing.  It was like if you stuck

7   your fingers in your ears and tried to hear.  And after those

8   tubes were in his ears, I mean, it just opened up a whole new

9   world for this young man.  He began to hear and thrive and

10   talk and -- it was just amazing.

11          And he has been involved in his life with sports.  He

12   coached his -- I think it was basketball and soccer.  You

13   know, there was a side of Stephan that was very family

14   orientated.  I don't know how he got off into this stream that

15   he did.

16          And then he has a daughter, Isabela.  And I was

17   trying to think of different ways I could explain their

18   relationship but she has always been a daddy's girl and she is

19   a daddy's girl, and when this happened, she went into a deep

20   depression and because Stephan being out of the picture, I

21   wasn't allowed to be really involved in her life very much

22   anymore, but her mother had enough precedent to realize that

23   she was depressed and she was threatening suicide.  At nine

24   years old she wanted to kill herself.  She didn't want to live

25   anymore.  And I got her in to see a counselor and the

1    counselor diagnosed her at a high risk for suicide and got her

2    in as an outpatient at Sundance to receive therapy which she

3    responded to very well.

4          She went -- I believe -- I was trying to remember, it

5    was four to six weeks patient therapy at Sundance in Fort

6    Worth and then we saw her counseling once a week Saturday for

7    four to six weeks and her relationship with her dad, her dad

8    has now been restored and she is visiting him on a regular

9    basis and I'm just hoping that, you know, when he is

10   sentenced, that he can be close enough, if he can't come home,

11   that he can be close enough for her and maybe Tristan to keep

12   in touch with him.  He's been a very strong person in their

13   lives, influence in their lives in a positive way.

14         And -- and then -- oh, just one more thing about

15   Tristan.  When Stephan came into his life, he didn't eat

16   anything that wasn't shaped in the form of a chicken nugget.

17   If it wasn't in that shape or a chicken nugget, he just

18   wouldn't eat it and Stephan introduced him to foods, he

19   started eating vegetables and, you know, he just -- he really

20   invested some time and energy into this boy and into his

21   family and I just ask you to show -- show him some mercy.

22         **THE COURT:**  Thank you, ma'am.

23         **MR. STICKELS:**  Thank you, Your Honor.  Your Honor, we

24   filed a sentencing memorandum in this case that outlined

25   Mr. Hamilton's background and his character and we would ask

1   the Court to consider the Sentencing Memorandum in sentencing

2   Mr. Hamilton.

3         In addition to the 5K1, Mr. Hamilton also provided

4   information to the Eastern District of Texas and others

5   concerning methamphetamine dealing.  Mr. Hamilton has done

6   everything within his power after he was arrested to

7   rehabilitate himself and to do everything that he can to make

8   up for his crime and we would ask the Court to consider all

9   that in sentencing him.

10        **THE COURT:**  Thank you, sir.  Mr. Hamilton, do you

11  wish to speak on your behalf or present information in

12  mitigation of your sentence?

13        **THE DEFENDANT:**  Yes, sir, I do.

14        **THE COURT:**  I would be pleased to hear from you.

15        **THE DEFENDANT:**  I'm sorry.  It's a little lengthy,

16  but -- I would like to address my mother first, if that is

17  okay.  And then I'm going to address the Court.

18        Thank you, Mama, for never giving up on me, for all

19  the encouragement during the worst of times, for every prayer

20  on your own, on the phone, or at visitation.  Thank you for

21  being strong when I couldn't and always reminding me that the

22  Lord has greater plans for me despite what circumstances

23  suggest.  Thank you for instilling the belief in me that if I

24  stay the course and keep my eyes on Jesus that I will

25  overcome.  There is no mother like you and I love you.

1          Be it words from either Nelson Mandela or the Apostle

2     Peter, I have found a consistent confirmation about prison,

3     trials, and character.  Mandela wrote that prison is a type of

4     crucible that tested a man's character.  Some men, under the

5     pressure of incarceration, showed true metal while others

6     revealed themselves as less than what they appeared to be.

7          The Apostle Peter wrote, "In this you greatly rejoice

8     though now for a little while, if need be, you have been

9     grieved by various trials, so that the genuineness of your

10    faith, being much more precious than gold, it perishes though

11    it is tested by fire, may be found to praise, honor, and glory

12    at the revelation of Jesus Christ."

13         These statements by great men encourage me to place

14    myself into a fire seeking my genuine purpose in this life

15    while purging to the surface the fears that reside within me.

16    A true man, to me, I have found, admits his wrongs, faces the

17    faults inside of him, and seeks to make restitution whenever

18    possible.  My struggle to do just that almost broke me.  The

19    truths and revelations about who I was and where I was going

20    were a weight that almost convinced me to give up.  In my

21    darkest moment, consumed by fear, I submitted the whole of my

22    life to the Lord and that -- and asked that He take this

23    burden or take my life.  In that moment I felt grace and I saw

24    purpose in my future and redemption from my past.  I saw that

25    even suffering can have purpose if in it one can prevent

1    further or future suffering or use the experience to mend the

2    suffering of others.  I lived for far too long with a hole in

3    my life.  I have tasted, tested, and tried substances and

4    actions too great to list all in a vein attempt to fill avoid.

5    In a spirit of greed I once believed that I could consume and

6    acquire my way to fulfillment.  In all actuality, I have

7    learned the truth that a man should not be measured by what

8    conquests or riches he can lay claim to but by his actions and

9    those efforts made when sacrifice rather than gain are at

10   hand.  It is not that which a man can take but that which he

11   gives that feeds his soul.  Up until this experience, I have

12   often taken more than I have given.

13          In the actions that I have committed to place myself

14   before this Court, I have placed a burden on my family as well

15   as my country.  Today before all of you I am the to make a

16   declaration publicly that I made to myself privately some

17   months ago.  In every opportunity I will serve.  I will serve

18   those in need and those in want.  From the ashes of what I

19   once was I will become a lighthouse to the lost.  I will not

20   just strive to make a difference, I will seek to be the

21   difference.  I have been blessed beyond measure with a sound

22   mind, a grateful spirit, and a burning desire to overcome.

23          In my future, at every opportunity, I will use all of

24   my life experiences, even the darkest and most painful, to

25   shed light and offer direction to anyone that will listen.  To

1   society I owe a great debt and wish to undertake the task of

2   repayment as soon as possible.  In every circumstance, in

3   every school that will have me, to any person or community

4   that will listen, I will share my knowledge, experiences, and

5   foresight to battle the methamphetamine epidemic.

6          To the families of addicts I will work provide

7   understanding and encouragement remain whole.  To the addicts

8   themselves I will give hope.  I pledge that this will never be

9   a sideline.  It will be my life's work.  I, better than most,

10  understand the dire battle against methamphetamine.  I want

11  nothing more than to educate, defend, and overcome its evils.

12  At the end of my journey on this earth I want to know that the

13  suffering and destruction I caused became the experience and

14  catalyst for change in not only me but in the lives of others.

15         More than any written or spoken words can state, in

16  the language that is simply action and resolve, I ache to be

17  part of the solution.  While I must be held accountable for my

18  actions, I ask that in me you see an opportunity for

19  greatness, for change, and for just mercy.

20         Because I have underachieved my abilities, because I

21  have disappointed those who do matter, because in my past I

22  have sacrificed what is good and right for the love of self,

23  because of all these things I want to make good on that which

24  God has given me.

25         I want my Mama, my daughter, my son, my community and

1   my God to be pleased with the man that I have become and proud

2   of what I have given back in time, effort, heart, and results

3   to the world.  For this I need time.  I have plans,

4   contingency plans, and contingency plans for contingency

5   plans.  I am prepared for the failures that often proceeds

6   triumph.  This time that I've spent incarcerated, these

7   sixteen months, have given me time to be in a wilderness of

8   sorts, to have a revelation experience not unlike the Apostle

9   Paul's when the scales fell from his eyes.  I see with new

10  eyes and I now see that I have a family that believes in me, a

11  God that loves me, and a determination inside of me that

12  together will give me all that I need to overcome and be the

13  difference that I know that I can be in this world.

14          Thank you.

15          **THE COURT:**  Thank you, sir.

16          **MR. WOLFE:**  You may have mentioned this and I just

17  didn't catch it and I don't believe this affects the overall

18  sentencing, but there is a waiver reduction on file pursuant

19  to 3582.

20          **THE COURT:**  Okay.  Is that the case, Mr. Stickels?

21          **MR. STICKELS:**  Yes, Your Honor.  And whatever

22  guideline the Court deems appropriate we ask the Court to

23  deviate downward two levels.

24          **THE COURT:**  Okay.  Is that your understanding,

25  Mr. Hamilton, that you're waiving your right to seek a 3582

1  reduction?

2       THE DEFENDANT:  Yes, sir.

3       THE COURT:  All right.  I will reduce the offense

4  level by two levels.  I don't believe it affects the

5  guidelines -- Mr. Wolfe, what consideration did you give to

6  filing a count for 924(c)?

7       MR. WOLFE:  Your Honor, we -- may I have just a

8  moment?

9    (Off-the-record discussion between Mr. Wolfe and the case

10  agent.)

11      MR. WOLFE:  Your Honor, we -- I'm sorry.  Your Honor,

12  we did give consideration but because of his cooperation we

13  chose not to file that.

14      THE COURT:  All right.  Very good.  I will now state

15  the sentence determined pursuant to Title 18 United States

16  Code Section 3553 treating the guidelines as advisory only.

17  In arriving at a reasonable sentence, I've taken into account

18  primarily the conduct admitted in the Factual Resume as well

19  as those matters required to be considered by 3553.

20          This is -- It is the judgment of the Court that the

21  Defendant, Stephan Hamilton, is committed to the custody of

22  the Federal Bureau of Prisons for a period of 240 months.

23          I do not order a fine.

24          It is ordered that upon his release from prison he be

25  placed on supervised release for 3 years.

1          While on release he shall comply with the standard

2     conditions contained in this judgment and comply with the

3     following additional conditions:

4          He shall not commit another federal, state, or local

5     crime.

6          He shall not possess illegal controlled substances.

7          He shall cooperate in the collection of DNA as

8     directed by his probation officer.

9          He shall refrain from any unlawful use of a

10    controlled substance, submit to one drug test within 15 days

11    of release from prison, and at least two periodic drug tests

12    thereafter as directed by the probation officer.

13         He shall participate in a program approved by the

14    Probation Office for the treatment of narcotic drug or alcohol

15    dependency that will include testing for the detection of

16    substance use or abuse.

17         He shall abstain from the use of alcohol and all

18    other intoxicants during and after completion of treatment and

19    contributing to the cost of services rendered at a rate of at

20    least $25 per month.

21         He is also ordered to pay a mandatory special

22    assessment of $100.

23         I believe this is the appropriate sentence, given all

24    of the facts and circumstances, and that this sentence is

25    sufficient, but not greater than necessary, to comply with the

1    statutory purposes of sentencing.

2         Even if I'm wrong as to any of my rulings on the

3    objections, this is the sentence I otherwise would impose in

4    this case.

5         I believe that this sentence is appropriate, even

6    with the granting of the motion -- the Government's Motion For

7    Downward Departure under Rule 5K because the Government has

8    chosen to file -- indict the defendant and allow him to plead

9    to a case that caps his exposure at 20 years when his true

10   exposure should be life in prison and a minimum of 360 months

11   under the guidelines.

12        In addition, it appears to me that there would be

13   ample evidence in this case to also assert a 924(c) charge

14   against the defendant which would also include a 60 month

15   mandatory consecutive sentence to any other sentence I would

16   impose and so on the charging decisions alone the defendant

17   has received the benefit of at least a 15 year in prison

18   reduction.

19        When I take into account then the facts mentioned in

20   the Government's Motion For Downward Departure under Rule 5K

21   and the defendant's Sentencing Memorandum, I believe that

22   taking those facts into account and considering those facts

23   with the nature and circumstances of this offense, the

24   defendant's criminal history, which includes a burglary of a

25   building, theft, false statement, DWI, he was tampering with a

1   government record, in other words he had a false passport

2   while he was smoking methamphetamine, during the search five

3   firearms, methamphetamine, and $10,000 were recovered from a

4   closet and in one of the arrests the defendant had a firearm

5   in his waistband.  He was on his way to sell drugs and bonded

6   out of jail and continued to sell drugs.  When I consider all

7   of those facts, I believe a 15 year reduction in this case is

8   the appropriate reduction for the Rule 5K.

9           I've now stated the sentence.  Is there any reason

10  why that sentence should not be imposed?

11          **MR. WOLFE:**  Your Honor, the Government has no

12  objections but I would like to clarify just one thing only for

13  the purposes of the record.  The Court was giving the Court's

14  reasons for where the Court sentenced and mentioned that but

15  for the Government's capping him at 20 he would have been a

16  360 to life.  Just for the purposes of record, I think now

17  with the two level reduction he would be at 292 to 365.  I

18  don't know if that would change the Court's sentence, I just

19  want to have that on the record so it's clear later on.

20          **THE COURT:**  Hold on one moment, please.

21          **MR. WOLFE:**  I believe he was at a 39 and an IV.

22          **THE COURT:**  Yes.  Okay.  You are correct.  The

23  guidelines will be 292 to 365.  But my reasoning is still the

24  same and I don't -- I decline to change my final conclusion,

25  that is that the charging decisions alone in this case have

1   provided the defendant the appropriate 5K benefit.

2            Any objection from the Defense?

3            **MR. STICKELS:** No, Your Honor.

4            **THE COURT:** Then I'll order the sentence imposed

5   another stated.

6            Mr. Hamilton, you have the right to appeal your

7   sentence. You also have the right to apply for leave to

8   appeal in forma pauperis if you are unable to pay the costs of

9   an appeal and if you decide to appeal your notice must be

10  filed within 14 days. Please talk tour attorney about your

11  appellate rights and he will advise you appropriately.

12           Is there anything else we should take up from the

13  Government?

14           **MR. WOLFE:** No, Your Honor. Thank you.

15           **THE COURT:** From the defense?

16           **MR. STICKELS:** No, Your Honor.

17           **THE COURT:** Then we are in recess on this case.

18  Thank you both for being here and good luck to you,

19  Mr. Hamilton.

20

21

22

23

24

25

1      I, **DENVER B. RODEN**, United States Court Reporter for the

2  United States District Court in and for the Northern District

3  of Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6      **WITNESS MY HAND** on this 15th day of May, 2014.

7

8                                    /s/ Denver B. Roden

9                                    **DENVER B. RODEN, RMR**
                                     *United States Court Reporter*
10                                   1050 Lake Carolyn Parkway #2338
                                     Irving, Texas  75039
11                                   *drodenrmr@sbcglobal.net*
                                     **Phone**:  (214) 753-2298
12

13

14

15

16

17

18

19

20

21

22

23

24

25